PENSION COMMITTEE FOR FARMSTEAD FOODS PENSION PLAN FOR ALBERT LEA HOURLY EMPLOYEES; Pension Committee for Farmstead Foods Pension Plan of the Cedar Rapids, Iowa Facility; Farmstead Foods Pension Plan for Albert Hourly Employees; Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility, and Norwest Bank Minnesota, National Association, as trustee for the Farmstead Foods Pension Plan for Albert Lea Hourly Employees and as Trustee for the Farmstead Foods Pension Plan for the Hourly Employees of the Cedar Rapids, Iowa Facility, Plaintiffs,

v.

PENSION BENEFIT GUARANTY CORPORATION, and Locals 6 and P-3, United Food and Commercial Workers International Union, AFL–CIO, and United Food and Commercial Workers International Union, AFL–CIO, Defendants.

In re FARMSTEAD FOODS PENSION PLAN FOR HOURLY EMPLOYEES OF CEDAR RAPIDS MEATS, INC.

PENSION BENEFIT GUARANTY CORPORATION, Applicant,

v.

PENSION COMMITTEE FOR FARMSTEAD FOODS PENSION PLAN FOR HOURLY EMPLOYEES OF CEDAR RAPIDS MEATS, INC., Respondent.

In re FARMSTEAD FOODS PENSION PLAN FOR HOURLY EMPLOYEES OF THE ALBERT LEA FACILITY.

PENSION BENEFIT GUARANTY CORPORATION, Applicant,

v.

PENSION COMMITTEE FOR FARMSTEAD FOODS PENSION PLAN FOR HOURLY EMPLOYEES OF THE ALBERT LEA FACILITY, Respondent.

Civ. Nos. 4–91–510, 4–91–547 and 4–91–571.

United States District Court, D. Minnesota, Fourth Division.

Oct. 16, 1991.

Carol Connor Flowe, Jeanne K. Beck, Philip R. Hertz, Nancy S. Heermans, John A. Sutter, Carolyn E. Weissbach, Pension Benefit Guar. Corp., Washington, D.C., and Mary E. Carlson, Minneapolis, Minn., for Pension Benefit Guar. Corp.

Anthony R. Battles, Bruce W. Blackburn, Oppenheimer Wolff & Donnelly, Minneapolis, Minn., for Pension Committee for Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility, Pension Committee for Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility, Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility, and Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility.

Russell Woody, Gillian F. Siegel, Cotton, Watt, Jones & King, Chicago, Ill., Maurice N. Lazarus, Robert D. Metcalf, Garber & Metcalf, P.A., Minneapolis, Minn., for United Food and Commercial Workers Intern. Union, AFL–CIO, its Affiliated Locals P–3 and 6, Plan Participants Edward A. Anderson, Luverne R. Bock, Wayne Hoyne, Roy E. Kraushaar, John A. Mauer, Ross W. Moyer, Derby G. Olsen and Frank A. Wakefield.

Thomas L. Kimer, Faegre & Benson, Minneapolis, Minn., for Norwest Bank Minnesota, Nat. Ass'n, as Trustee for Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility and as Trustee for Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility.

## ORDER

DOTY, District Judge.

This matter is before the court on the consolidated motions of the Pension Benefit Guaranty Corporation for orders to show cause (1) why the Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility and the Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility should not be terminated, (2) why June 13, 1990, and October 1, 1990, should not be the respective dates of those Plans' termination, and (3) why the Pension Benefit Guaranty Corporation should not be appointed trustee of both Plans. The Pension Committees for the Farmstead Foods Pension Plans moved for a declaratory judgment on the same issues. Based on the file, record and proceedings herein, and for the reasons stated below, the court finds both Plans are terminated, that June 13, 1990, and October 1, 1990, are their respective dates of termination, and that the PBGC is the trustee of both Plans.

## BACKGROUND

This case involves questions regarding the termination of employee benefit plans,

establishing termination dates and selecting a trustee to oversee the distribution of the plans' assets. Farmstead Foods (Farmstead) owned Cedar Rapids Meats, Inc., ("CRM") an Iowa Corporation, and Cornbelt Meats, Inc., ("Cornbelt") a Minnesota corporation. Pursuant to a series of collective bargaining agreements, Farmstead established the Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility ("CRM Plan") and the Farmstead Foods Plan for Hourly Employees of the Albert Lea Facility ("Cornbelt Plan") (together the "Plans") to provide retirement income for certain of its employees and their beneficiaries. The Employee Retirement Income Security Act ("ERISA") governs the Plans, see 29 U.S.C. § 1321(a), and the Plans are subject to ERISA's plan termination insurance provisions. See 29 U.S.C. §§ 1301–1461.

### 1. Cedar Rapids Meats

CRM ceased operations on March 9, 1990, and its employees were discharged. Although Section 30.1 of CRM's collective bargaining agreement with its employees' union required CRM to give six months prior written notice of its plant closing and guaranteed that affected employees would continue working or receiving pay in lieu of working during the six month notice period, CRM did not give such notice. On March 14, 1990, CRM filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Iowa (No. L–90–00445C).

CRM also sought relief in the Iowa Bankruptcy Court from the provisions of its collective bargaining agreement requiring it to make contributions to the CRM Plan. The union and the Pension Benefit Guaranty Corporation [1] ("PBGC") opposed this requested relief, claiming that the Internal Revenue Code ("IRC") and ERISA do not permit a debtor to be relieved of its statutory funding obligations under ERISA and the IRC. Rather, the union and the PBGC claimed that the pension plan funding obligation applied until plan termination. Subsequently, the bankruptcy court denied CRM's motion. On or about April 13, 1990, the CRM Plan initiated a voluntary distress termination of the Plan and filed a Notice of Intent to Terminate with the PBGC and notified all CRM Plan participants of this filing. See 29 U.S.C. § 1341(c)(1)(A). CRM proposed June 13, 1990, as the date of termination for the CRM Plan in order to comply with the statutorily mandated sixty-day notice to affected parties. See 29 U.S.C. § 1341(c)(1)(A). The PBGC did not immediately act on the CRM's attempt to initiate a voluntary distress termination.

In May 1990, CRM moved the bankruptcy court to terminate the CRM Plan. The PBGC filed a response to CRM's motion to terminate in which it asserted: (1) that it was for the PBGC, not the court, to effectuate a termination of the CRM Plan pursuant to Section 4041(c) of ERISA, 29 U.S.C. § 1341(c), and that, to the extent CRM's motion sought court approval of termination of the CRM Plan, it should be denied; and (2) if the motion was a motion for the court to determine the existence of the distress criterion under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV), the court should require CRM to submit evidence that, absent termination, it would be unable to pay its debts when due and would be unable to continue in business unless the CRM Plan was terminated. The PBGC also expressly noted that CRM's right to voluntarily terminate the CRM Plan was contingent upon the termination not violating any applicable collective bargaining agreement. The PBGC, however, did not take a position as to the requirements of CRM's collective bargaining agreements. The Iowa Bankruptcy Court did not rule on CRM's motion.

Although the CRM Plan had not been declared terminated, the Pension Committee for Farmstead Foods Pension Plan for

---

**1.** The Pension Benefit Guarantee Corporation (PBGC) is a wholly-owned United States Government Corporation established under 29 U.S.C. § 1302(a), to administer the mandatory pension plan termination insurance program established by Title IV of ERISA. The PBGC guarantees the payment of certain pension benefits provided by pension plans that terminate when they are covered by Title IV of ERISA. 29 U.S.C. §§ 1302(a)(2), 1322, 1361.

Hourly Employees of the Cedar Rapids, Iowa Facility ("CRM Pension Committee"), in reliance on the Notice of Intent to Terminate filed on April 13, 1990, and on 29 U.S.C. § 1341(c)(3)(D)(ii)(IV), instructed Norwest Bank, as Trustee for the CRM Plan, to reduce monthly benefit payments to CRM Plan participants to the level the PBGC guaranteed. This reduction was effective June 13, 1990. As a result, payments to participants receiving plant closing pension benefits under section 5.5 of the CRM Plan were reduced from 150% to 100% of the participants' unreduced accrued normal retirement benefit as determined by the CRM Pension Committee, and payments to participants receiving Thirty Year Service Pension benefits under section 5.6 of the CRM Plan were reduced by elimination of the $100 monthly supplement under section 5.6(c)(2) of the CRM Plan. The union estimates that the resulting loss to participants is approximately $68,000 per month, amounting to more than $952,000 to date.

## 2. *Cornbelt Meat*

The events leading to the Cornbelt Plan's termination are similar to those underlying the CRM Plan's demise. On March 20, 1990, Cornbelt ceased substantially all production operations at its plant and discharged its employees. Cornbelt's collective bargaining agreement with its employees' union contained a plant closing provision identical to that contained in CRM's collective bargaining agreement. Nevertheless, Cornbelt did not give the appropriate notice of closing. On March 28, 1990, Cornbelt filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota (Case No. BKY 4–90–01660).

On August 1, 1990, the Cornbelt Plan initiated a voluntary distress termination pursuant to 29 U.S.C. § 1341(c), and following the procedures outlined in ERISA, filed a Notice of Intent to Terminate with the PBGC and notified all Cornbelt Plan participants of this filing. 29 U.S.C. § 1341(c)(1)(A). Cornbelt proposed October 1, 1990, as the date of termination for the Cornbelt Plan in order to comply with the statutorily mandated sixty-day notice to affected parties. 29 U.S.C. § 1341(c)(1)(A). On or about August 16, 1990, Cornbelt filed with the Minnesota Bankruptcy Court a motion to terminate the Cornbelt Plan. The union filed an objection to this motion, challenging the attempted termination. The PBGC filed a response to the motion that was virtually identical to the response it filed in the Iowa Bankruptcy Court to CRM's motion to terminate the CRM Plan. In light of the response of the union and PBGC, Cornbelt withdrew its motion.

On September 4, 1990, the union informed the PBGC that it objected to the proposed voluntary termination of the Cornbelt Plan. The union alleged that the termination violated the collective bargaining agreement and 29 U.S.C. § 1341(a)(3).[2] On September 17, 1990 counsel for the union and the Cornbelt Pension Committee met and discussed the issues the grievance raised. Counsel agreed that participants in the Cornbelt Plan were entitled to service credit for any periods of accrued, unused vacation entitlement and for the six month notice of closing period. No agreement was reached, however, with respect to Cornbelt's claim that it had the unilateral authority to terminate the Cornbelt Plan, and whether benefits payable under the Cornbelt Plan had been properly determined. Pursuant to Section 9.3(a) of the Cornbelt Plan, those issues were submitted to arbitration.[3]

---

**2.** Section 4041(a)(3) of ERISA provides:

(3) ADHERENCE TO COLLECTIVE BARGAINING AGREEMENTS.—The [PBGC] shall not proceed with a termination of a plan under this section if the termination would violate the terms and conditions of an existing collective bargaining agreement. Nothing in the preceding sentence shall be construed as limiting the authority of the corporation to institute proceedings to involuntarily terminate a plan under Section 4042.

**3.** The local union representing the CRM Plan employees filed a similar grievance on November 1, 1990. The union and the CRM Pension Committee agreed to extend to the Cedar Rapids Plan the understandings previously reached between the union and the Cornbelt Pension Committee and to submit to the arbitrator the same

Despite these proceedings, and even though the Cornbelt Plan had not been declared terminated, the Pension Committee for Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility ("Cornbelt Pension Committee"), in reliance on the Notice of Intent to Terminated filed August 1, 1990, and on 29 U.S.C. § 1341(c)(3)(D)(ii)(IV), instructed Norwest Bank, as Trustee for the Cornbelt Plan, to reduce monthly benefit payments to Cornbelt Plan participants to the level the PBGC guaranteed. This reduction was effective October 1, 1990. As a result, the reduction in benefits to the Cornbelt Plan participants was identical to the earlier reduction in the CRM Plan. The union estimates the resulting loss to participants is approximately $39,500 per month, amounting to more than $434,000 to date.

On February 7, 1991, the PBGC notified the CRM Pension Committee and the Cornbelt Pension Committee that it was instituting involuntary termination proceedings pursuant to 29 U.S.C. § 1342 and indicated that the appropriate dates to reduce benefits to the PBGC guaranteed level were the original proposed termination dates of June 13, 1990, with respect to the CRM Plan and October 1, 1990, with respect to the Cornbelt Plan. Additionally, the PBGC requested that the Pension Committees enter into a trusteeship agreement with the PBGC pursuant to 29 U.S.C. § 1342(b)(3). The unions demanded that the pension committees restore the benefits to the level in effect prior to the reduction to the PBGC guaranteed level and contended that the pension committees were without authority to enter into a trusteeship agreement with the PBGC without union consent.

On May 28, 1991, the arbitrator ruled that Cornbelt and CRM did not have power to terminate the Plans without the consent of the unions and awarded vesting and benefit accrual credits to certain partici-

pants under the Plans.[4] The arbitrator, however, did not address the following: (1) any issues arising under ERISA, (2) whether the reduction in benefits to the PBGC guaranteed level was appropriate, (3) whether benefits should be restored to their former levels, or (4) whether the pension committee had the power to enter into a trusteeship agreement with the PBGC.

On July 1, 1991, the Pension Committee for Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility ("CRM Pension Committee"), the Pension Committee for Farmstead Foods Pensions Plan for Hourly Employees of the Albert Lea Facility, ("Cornbelt Pension Committee"), the CRM Plan, the Cornbelt Plan, and Norwest Bank Minnesota, National Association filed a complaint for Declaratory Judgment (Civ. No. 4–91–510) in this court. In that complaint, the plaintiffs requested a judgment declaring whether June 13, 1990, was the correct date of termination for the CRM Plan and whether October 1, 1990, was the correct date of termination for the Cornbelt Plan. The plaintiffs also requested a judgment as to whether the pension committees had the authority, without the unions' consent, to enter into trusteeship agreements with the PBGC pursuant to ERISA, 29 U.S.C. § 1342(b)(3), in connection with the termination of the Plans.

Before the court ruled on that motion, the PBGC proceeded with its involuntary termination of the Plans and filed two separate motions (Civ. No. 4–91–547 and Civ. No. 4–91–571) for orders to show cause why the court should not: (1) terminate the CRM and Cornbelt Plans; (2) appoint the PBGC as statutory trustee of the Plans; and (3) establish June 13, 1990, as the date of termination of the Cedar Rapids Plan and October 31, 1990, as the date of termination of the Cornbelt Plan. The PBGC further alleged that orders terminating the

issues under the CRM plan as were being submitted pursuant to the Cornbelt Plan.

**4.** The PBGC informed the parties and the arbitrator that the PBGC believed that it was not bound by any decision made in the course of the consolidated arbitration concerning benefit

entitlement of the participants in the Plans, referred to the possibility that the Plans would be terminated in the near future and stated that the arbitrator's decision would not have a bearing on an action to terminate the Plans the PBGC initiated under ERISA.

Plans and establishing the termination date of the Plans would moot the declaratory judgment action that the Pension Committees brought. (Civ. No. 4-91-510). The three actions were consolidated pursuant to Rule 42(a) of the Federal Rule of Civil Procedures and the court issued Orders to Show Cause on July 26, 1991. The unions were granted leave to intervene in Civ. No. 5-91-547 and Civ. No. 5-91-571 on August 28, 1991.

## DISCUSSION

Based on the court's July 26, 1991 order to show cause, the only issues now before the court are (1) whether the Plans should be terminated, (2) whether June 13, 1990 is an appropriate termination date for the CRM Plan and whether October 1, 1990 is an appropriate termination date for the Cornbelt Plan, and (3) whether the PBGC should be appointed statutory trustee of the Plans.

During oral arguments the parties agreed that the plans should be terminated and the court found that the plans were terminated. The route to this determination, as the facts indicate, was somewhat long and tortuous. Both CRM and Cornbelt endeavored to use the voluntary distress termination procedures. 29 U.S.C. § 1341(c). That path was not successful, however, because of the opposition of the unions and the PBGC. The unions believed that the voluntary distress termination, initiated without a six-month notice of plant closing, violated the terms of the collective bargaining agreement, thereby violating ERISA. *See* 29 U.S.C. § 1341(a)(3). The PBGC apparently believed that it did not have sufficient information to allow the companies to proceed with a voluntary distress termination. Eventually, however, the PBGC determined that the Plans would be unable to pay benefits due and initiated an involuntary distress termination on February 7, 1991. *See* 29 U.S.C. § 1342(a)(2). The PBGC moved the court on July 22, 1991, to declare the plan terminated. 29 U.S.C. § 1342(c). Based on this motion for an involuntary termination of the Plans, the court found on August 30, 1991, that the Plans were involuntarily terminated.

29 U.S.C. § 1342. Therefore, the court now need only consider the appropriate termination dates of the Plans and whether the PBGC should be appointed trustee of the Plans.

### 1. *Termination Date*

The PBGC and the Plan administrator may determine by agreement a pension plan's termination date. 29 U.S.C. § 1348(a)(3). Here the termination date is in dispute. Therefore, the court must establish a termination date in accordance with the provisions of 29 U.S.C. § 1348(a)(4).

To determine a termination date the court will use the analysis first set out in *Pension Benefit Guar. Corp. v. Heppenstall Co.*, 633 F.2d 293 (3d Cir.1980). The Third Circuit ruled that "the court must select the date which it determines is most consistent with the purposes of the [statute]." *Id.* at 297. The statute addresses the purposes to be accomplished as:

> protect[ing] the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.

29 U.S.C. § 1342(c). Therefore, the court's goal in setting a termination date is to find a date that balances the interests of the plan participants with protecting the fund from overpayment.

The Third Circuit in *United Steelworkers of Am. v. Harris & Sons Steel Co.*, 706 F.2d 1289 (3d Cir.1983) (quoting *In re Braniff Airways, Inc.*, 24 B.R. 466, 472 (Bankr.N.D.Tex.1982) (a decision utilizing the *Heppenstall* analysis) further refined *Heppenstall*, by applying a three part analysis: " '[first] identify the interests of all of the plan participants and the PBGC, [second] establish the parameters which maximiz[e] those respective interests, and [third, within the limits of the statute] set the termination date accordingly.' " *Id.* at 1296.

The PBGC has established a termination date and the court will give deference to that choice. In *Heppenstall,* the court ac-

corded the PBGC's suggested termination date only fair consideration. 633 F.2d at 301. There, however, the PBGC attempted to limit its liability by selecting a relatively early termination date and advocated a date that was not based on any interpretation of ERISA. The court found that PBGC's choice did not merit much deference. Where the PBGC is interpreting Title IV of ERISA, however, and where the facts found in *Heppenstall* are not present, the views of the agency are due greater deference than the court accorded there. *See United Steelworkers of America,* 706 F.2d at 1296; *see also Connolly v. Pension Benefit Guar. Corp.,* 581 F.2d 729, 730 (9th Cir.1978) ("the determination of the PBGC ... is entitled to great deference in the construction and application of ERISA."). Accordingly, the court will grant the PBGC's position deference.

### A. Interests of PBGC and Plan Participants

The PBGC has an interest is protecting its funds against increased liability. *Pension Benefit Guar. Corp. v. Maryland Glass Corp.,* 618 F.Supp. 1410, 1414 (D.Md. 1985). When an employer underfunds its pension plan and is unable to finance a minimum level of benefits, PBGC, pursuant to its statutory mandate, pays those benefits. *See* 29 U.S.C. § 1322. The employer, however, becomes liable to the PBGC for the funds which PBGC must pay out on the plan's behalf. ERISA § 4062, 29 U.S.C. § 1362(b). Because of problems the PBGC experienced in recovering from employers under § 1362, Congress amended that provision to increase the amount of the employer's liability to the PBGC. ERISA currently permits the PBGC to recover the full amount of a plan's unfunded liability at the date of termination. 29 U.S.C. § 1362. Yet, because voluntary distress terminations and involuntary terminations often involve bankrupt corporations with deteriorating financial conditions, as here, the date of termination can seriously affect the amount of money the PBGC actually recovers from the employer. Therefore, the PBGC's interest lies in selecting the earliest possible termination date so that the amount of the payments it must make will be smaller, reducing the amount of money it must attempt to collect from employers. Here, the PBGC argues that June 13, 1990, and October 1, 1990, are the earliest appropriate termination dates for the CRM and Cornbelt Plans, respectively, because those dates are consistent with ERISA's termination procedure and current case law. The PBGC claims that the participants had constructive and actual notice of termination on those dates and they protect PBGC's interests in not incurring unreasonable increases in liability.

The interests of participants are more varied. Both the interests of the retirees and employees must be considered. *Heppenstall,* 633 F.2d at 301; *Maryland Glass Corp.,* 618 F.Supp. at 1414. A participant "means any employee or former employee of an employer ... who is or may become eligible to receive a benefit ... or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

The record does not contain any specific evidence regarding the impact of PBGC's proposed termination dates on retirees. The court assumes for purposes of setting a date that the effect will be similar to that experienced by employees. An earlier termination date might reduce the amount of the payments retirees currently receive or some benefits already received may be recaptured under 29 U.S.C. § 1345. *Maryland Glass Corp.,* 618 F.Supp. at 1414.

As for employees, the termination date fixes "the date beyond which, whether or not they continue to work, they no longer accrue additional vested pension rights." *Heppenstall,* 633 F.2d at 301. The unions believe that July 22, 1991, the date on which the PBGC filed this suit, is the appropriate date for terminating the Plans because that is the date participants lost any further expectations of benefits. The unions estimate significant losses of expected benefits in the Plans if the earlier date is chosen. Further, the unions allege that at least twenty to twenty-five additional employees would qualify for pension benefits under the CRM Plan and fifteen additional employees would qualify for pen-

sion benefits under the Cornbelt Plan under the date the unions propose. Because the PBGC only guarantees vested benefits, 29 U.S.C. § 1322(a), the PBGC would not cover those thirty-five to forty employees if the earlier dates were chosen.

### B. Setting the Parameters

In addition to plan participants' monetary concerns, the *Heppenstall* court analyzed participants' expectation and reliance interests. *Heppenstall*, 633 F.2d at 301–02; *Maryland Glass Corp.*, 618 F.Supp. at 1415. The *Heppenstall* court looked for the date when participants no longer had a justifiable expectation of accrual of vested pension rights. 633 F.2d at 302.

Several courts have held that plan participants have at least constructive notice of plan termination on the date the employer ceases operation, thereby terminating a justifiable expectation of accrual of vested pension rights. *See In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 201 (3d Cir.1983); *Heppenstall*, 633 F.2d at 301; *Maryland Glass Corp.*, 618 F.Supp. at 1415; *Pension Benefit Guar. Corp. v. Dickens*, 535 F.Supp. 922, 925 (W.D.Mich. 1982). Here, the CRM plant closed on March 9, 1990, and the Cornbelt plant closed on March 20, 1990, putting the employees on constructive notice that their pension plans could be terminated. Thus, March 9, 1990, and March 20, 1990, are the earliest potential Plan termination dates.

Plan participants also received actual notice of Plan termination during the companies' unsuccessful attempts to undertake voluntary distress terminations. When CRM initiated a voluntary distress termination on April 13, 1990, it gave CRM Plan participants sixty days notice of termination as ERISA requires. 29 U.S.C. § 1341(a)(2). Even though the plant had stopped operations the participants still accrued sixty days of benefits. That sixty day period ended on PBGC's proposed CRM Plan termination date of June 13, 1990. Likewise, when Cornbelt initiated a voluntary distress termination on August 1, 1990, it gave each of its Plan participants sixty days actual notice. That notice peri-od ended on the proposed October 1, 1990, termination date. Thus, June 13, 1990, and October 1, 1990, are another possible set of Plan termination dates. The PBGC supports these dates for Plan termination.

The unions argue that the earliest date on which the participants could have had notice, although still too early to be fair to the participants, was February 7, 1991, the date the PBGC issued its Notice of Determination and began involuntary termination proceedings pursuant to 29 U.S.C. § 1342. The unions base this allegation on the theory that the Plan participants' expectations of benefit accrual did not terminate when CRM and Cornbelt initiated voluntary distress terminations because they violated the collective bargaining agreement. Furthermore, the union argues that the *Heppenstall* court found that the earliest date on which a plan participant could have reasonable notice of Plan termination was the date on which the PBGC itself sought termination. Thus, February 7, 1991, also is a possible termination date for the Plans.

The unions, however, suggest that July 22, 1991, is the appropriate termination date for both Plans. July 22, 1991, is the date when the PBGC filed its motions for orders to show cause. The unions argue that is the date when the Plan participants no longer had any expectation interests. Thus, the court finds that July 22, 1991, is the latest potential termination for the Plans.

### C. Setting the Date

■ Having established that March 9, 1990, for the CRM Plan and March 20, 1990, for the Cornbelt Plan are the earliest possible dates on which Plan participants had constructive notice of Plan termination, the court will give deference to the PBGC's proposed June 13, 1990, termination date for CRM and October 1, 1990, termination date for Cornbelt and finds that those dates are the termination dates of the respective Plans. The selection of those dates adequately considers sufficient notification to the Plan participants and does not expose the PBGC to excess liability. Those

dates balance the competing interests of the Plan participants and the PBGC as effectively as possible.

The court finds that the unions' suggested termination dates are not appropriate. First, the court finds that the collective bargaining agreements do not address plan termination. The court will not impute from the agreement termination procedures and provisions other than those that ERISA and current case law provide.[5] The unions do not cite any case law that would provide otherwise. The parties agreed, and the court found, that the Plans were terminated. The arbitrator's decision that failing to give six months notice of plant closing breached the collective bargaining agreement, thereby violating ERISA, does not affect this analysis. The participants' expectation ended with the plant closing and actual notification of plan termination and any potential claims arising out of the improper notification of plant closing or breach of an alleged fiduciary duty are not before the court.

The court also finds that the unions' interpretation of *Heppenstall* is incorrect. As previously explained, *Heppenstall* involved an involuntary termination, and the statement that "the earliest date which could properly be selected by the court is that date on which participant employees had some reasonable notice that PBGC was seeking termination" from *Heppenstall* is limited to the particular facts of that case. The *Heppenstall* court merely used the PBGC notice to set one end of the parameter within which a plan termination date could be selected. Furthermore, the fact that it took the PBGC almost a year to initiate involuntary termination proceedings in the instant case does not affect the determination of the cessation of the participants' expectation.

### 2. *Selecting a Plan Trustee*

Whenever the PBGC determines that an involuntary termination of a pension plan is necessary, it may apply to the district court for appointment of itself or a third party to act as trustee of the plan. 29 U.S.C. § 1342(b)(1). In this case, the PBGC has moved that it be appointed trustee of both the CRM Plan and the Cornbelt Plan.

The unions object to the PBGC being appointed trustee. They claim that the PBGC is not needed to administer the distribution of benefits because the pension committees are already in place, are familiar with the CRM and Cornbelt Plans, and have not failed in performing their duties. In addition, they also claim that the PBGC has an inherent conflict-of-interest in serving as the trustee of plans it must insure because the PBGC will never want to make decisions that increase PBGC liability.

■ Although the court agrees that the unions' objections to the PBGC being appointed trustee have some merit, the court finds that appointing the PBGC as trustee of the Plans would best serve the interests of the participants, the PBGC and ERISA. Pragmatically, PBGC has more experience in dealing with plan terminations and is better equipped to handle the administrative problems that arise in terminating pension plans. Congress also specifically authorized the PBGC to perform a dual role as trustee and insurer even though this juxtaposition of responsibilities necessarily creates an inherent conflict-of-interest. The PBGC may move "that it be appointed as trustee of a plan in any case," even where enforcing PBGC regulations would deny participants some guaranteed benefits. 29 U.S.C. § 1342(b); *Piech v. Pension Benefit Guar. Corp.*, 744 F.2d 156, 161 (D.C.Cir.1984). In addition, Congress apparently did not envision that the plan trustee would zealously advocate participants' interests in opposition to the PBGC's interests. *Piech*, 744 F.2d at 161. The trustee's powers to advocate the participants' interests in a manner adverse to the PBGC is limited. *Id.* The trustee has a

---

5. The court also notes that even if the agreements prohibited termination of the Plans under any circumstances, ERISA provides that the PBGC may involuntarily terminate a pension plan, even in contravention of a collective bargaining agreement. 29 U.S.C. § 1341(a)(3). The plans at issue in the current case were terminated pursuant to the involuntary termination procedure. *See* 29 U.S.C. § 1342.

fiduciary obligation to insure that plan assets are properly administered and distributed to those participants entitled to receive them. 29 U.S.C. § 1104(a)(1)(A)(i). Thus, as the unions have not submitted any evidence that the PBGC has breached any statutory duty, the court finds that no sufficient conflict-of-interest exists to deny the PBGC's request to serve as the Plans' trustee.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. The Farmstead Foods Pension Plan for Hourly Employees of Cedar Rapids, Iowa Facility terminated pursuant to ERISA § 4042(c), 29 U.S.C. § 1342(c);

2. June 13, 1990, is the date of Plan termination for the Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility pursuant to ERISA § 4048(a)(4), 29 U.S.C. § 1348(a)(4);

3. The Pension Benefit Guaranty Corporation is appointed statutory trustee of the Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility pursuant to ERISA § 4042(b), 29 U.S.C. § 1342(b);

4. The Pension Committee for Farmstead Foods Pension Plan for Hourly Employees of Cedar Rapids Meats, Inc., Norwest Bank Minnesota, National Association and any other person or entity having records, assets or other property of the Farmstead Foods Pension Plan for Hourly Employees of the Cedar Rapids, Iowa Facility in their possession, custody or control shall transfer, convey or deliver such records, assets or other property to the Pension Benefit Guaranty Corporation pursuant to ERISA § 4042(d)(1), 29 U.S.C. § 1342(d)(1);

5. The Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility terminated pursuant to ERISA § 4042(c), 29 U.S.C. § 1342(c);

6. October 1, 1990, is the date of Plan termination for the Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility pursuant to ERISA § 4048(a)(4), 29 U.S.C. § 1348(a)(4);

7. The Pension Benefit Guaranty Corporation is appointed statutory trustee of the Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility pursuant to ERISA § 4042(b), 29 U.S.C. § 1342(b);

8. The Pension Committee for Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility, Norwest Bank Minnesota, National Association and any other person or entity having records, assets or other property of the Farmstead Foods Pension Plan for Hourly Employees of the Albert Lea Facility in their possession, custody or control shall transfer, convey or deliver such records, assets or other property to the Pension Benefit Guaranty Corporation pursuant to ERISA § 4042(d)(1), 29 U.S.C. § 1342(d)(1).