991 F.2d 1415
 61 USLW 2732, 16 Employee Benefits Cas. 2089
 PENSION COMMITTEE FOR FARMSTEAD FOODS PENSION PLAN FOR
ALBERT LEA HOURLY EMPLOYEES; Pension Committee For
Farmstead Foods Pension Plan for Hourly Employees of the
Cedar Rapids, Iowa Facility; Farmstead Foods Pension Plan
For Albert Lea Hourly Employees; Farmstead Foods Pension
Plan for Hourly Employees of the Cedar Rapids, Iowa
Facility; Norwest Bank, as trustee for the Farmstead Foods
Pension Plan for Albert Lea Hourly Employees and as trustee
for the Farmstead Foods Pension Plan for Hourly Employees of
the Cedar Rapids, Iowa Facility, Plaintiffs-Appellees,
v.
PENSION BENEFIT GUARANTY CORPORATION, Defendant-Appellee.
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,
LOCAL 6; United Food and Commercial Workers International
Union, Local P-3; United Food and Commercial Workers
International Union, AFL-CIO, Defendants-Appellants,
v.
PENSION BENEFIT GUARANTY CORPORATION, In Re: Farmstead
Foods Pension Plan for Hourly Employees of the
Cedar Rapids, Iowa Facility,
Plaintiffs-Appellees.
PENSION COMMITTEE FOR FARMSTEAD FOODS PENSION PLAN FOR
HOURLY EMPLOYEES OF the CEDAR RAPIDS MEATS, INC.,
Defendant-Appellee,
v.
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,
AFL-CIO, its affiliated Locals P-3 and 6, and Plan
Participants; Edward A. Anderson; Luverne R. Bock; Wayne
Hoyne; Roy E. Kraushaar; John A. Mauer; Roy W. Moyer;
Derby G. Olsen; Frank A. Wakefield, Intervenors-Appellants.
PENSION BENEFIT GUARANTY CORPORATION, Plaintiff-Appellee,
v.
Edward A. ANDERSON; Luverne R. Bock; Wayne Hoyne; Roy E.
Kraushaar; John A. Mauer; Roy W. Moyer; Derby
G. Olsen; Frank A. Wakefield;
Intervenors-Appellants,
Pension Committee for Farmstead Foods Pension Plan for
Albert Lea Hourly Employees, Defendant-Appellee.
 No. 92-1228.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 13, 1992.
Decided April 20, 1993.
 
 1
 Russell Woody, Chicago, IL, argued (Gillian Siegel, Chicago, IL, and Robert Metcalf and Maurice Lazarus, Minneapolis, MN, on the brief), for plaintiffs-appellants.
 
 
 2
 Nancy S. Heermans, Washington, DC, argued (Carol C. Flowe, Jeffrey B. Cohen, Philip R. Hertz, Lois B. Parks, and Carolyn E. Weissbach, Washington, DC, on the brief), for defendant-appellee.
 
 
 3
 Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges and BENSON,* Senior District Judge.
 
 
 4
 BENSON, Senior District Judge.
 
 
 5
 Farmstead Foods (Farmstead) owned and operated Cedar Rapids Meats, Inc. [hereinafter CRM], an Iowa corporation, located in Cedar Rapids, Iowa. It also owned and operated Cornbelt Meats, Inc. [hereinafter Cornbelt], a Minnesota corporation, located in Albert Lea, Minnesota. Through collective bargaining agreements, Farmstead established a pension plan for the hourly employees of CRM and a separate pension plan for the hourly employees of Cornbelt. The agreements in force between management and the Unions at both facilities mandated six months prior written notice be given to the hourly employees in event of a cessation of operations. The agreement also provided affected employees would receive wages for the six month notice period regardless of whether they continued to work or not. The object of the plans was to provide retirement benefits to eligible employees and their beneficiaries.
 
 
 6
 CRM and Cornbelt each encountered severe financial problems ultimately resulting in liquidation pursuant to chapter 7 of the Bankruptcy Code. CRM ceased operations on March 9, 1990, and discharged its employees. On March 14, 1990, CRM filed for bankruptcy. Cornbelt discharged its employees on March 20, 1990, after having ceased production operations. On March 28, 1990, Cornbelt filed for bankruptcy. Neither facility gave the required notice prior to closing. The issues before this court relate to the termination of the pension plans for the qualified hourly employees at each facility.
 
 
 7
 The pension plan at each facility was governed by the Employee Retirement Security Act [hereinafter ERISA],[1] and was subject to ERISA's plan termination insurance provisions.[2] The Pension Benefit Guaranty Corporation [hereinafter PBGC] is the federal agency charged with administering the pension plan termination insurance provisions of ERISA. Employers who provide ERISA qualified pension plans for their employees pay annual premiums to PBGC. It is these premiums that PBGC utilizes to pay benefits when a plan is terminated. 29 U.S.C. § 1307.[3] Through this system, plan participants in failed or under-funded pension plans, are afforded some degree of protection for the recoupment of their vested accrued benefits. See 29 U.S.C. § 1322 (limitations on benefits guaranteed by PBGC).
 
 
 8
 On April 13, 1990, CRM, pursuant to 29 U.S.C. § 1341, served notice on all interested parties of its intent to petition for voluntary distress termination of its pension plan. Cornbelt served a similar notice on August 1, 1990. CRM proposed June 13, 1990, as the termination date of its Plan. Cornbelt proposed October 1, 1990, as the termination date for its Plan. At the time of their notice of intention to seek voluntary distress termination of the pension plans, CRM and Cornbelt each instructed Norwest Bank, as trustee of the Plans, to reduce payments to pension plan recipients to the levels guaranteed by PBGC. The United Food and Commercial Workers International Union Locals 5 and P-3 [hereinafter Unions] objected to both terminations. They alleged the terminations violated the terms of the collective bargaining agreements and the provisions of 29 U.S.C. § 1341(a)(3). The issue was submitted to arbitration. The arbitrator ruled for the Unions.
 
 
 9
 On February 7, 1991, PBGC, taking the position that the decision of the arbitrator had no legal binding effect on it, notified CRM and Cornbelt Pension Committees of its intent to initiate involuntary termination proceedings of the pension plans pursuant to 29 U.S.C. § 1342. PBGC proposed June 13, 1990, and October 1, 1990, respectively as the dates for the termination of the Plans.
 
 
 10
 The matter was brought before the district court[4] on consolidated motions of PBGC for orders to show cause:
 
 
 11
 1. why the Pension Plans for the hourly employees of the Farmstead Cedar Rapids, Iowa, facility and of the Albert Lea, Minnesota, facility should not be terminated;
 
 
 12
 2. why June 13, 1990, and October 1, 1990, respectively should not be the termination dates of the Plans; and
 
 
 13
 3. why PBGC should not be appointed trustee of both Plans.
 
 
 14
 The Unions were granted leave to intervene. The pension committee for the Farmstead Food Pension Plans moved for a declaratory judgment on the three issues. The district court found the Pension Plans at each facility terminated pursuant to ERISA § 4042(c), 29 U.S.C. § 1342(c). It further determined the appropriate termination date for the Cedar Rapids facility as June 13, 1990, and for the Albert Lea facility to be October 1, 1990. The court, pursuant to ERISA § 4042(b), 29 U.S.C. § 1342(b), appointed the PBGC as statutory trustee for purposes of administering the pension plan at each facility. The Unions appeal.
 
 DISCUSSION
 
 15
 When the PBGC seeks involuntary termination, the Plan Administrator and the PBGC are authorized to issue a mutually acceptable date for plan termination. 29 U.S.C. § 1348(a)(2). If no agreement is reached, the resolution of an appropriate termination date becomes the prerogative of the court. 29 U.S.C. § 1348(a)(4). In these proceedings, there is agreement that the Pension Plans should be terminated. The parties do not agree on the selection of an appropriate termination date.
 
 
 16
 29 U.S.C. § 1348(a)(4) empowers the court to select a termination date, but the statute does not provide a standard to guide the court in the selection. This lack of guidance has resulted in litigation. In Pension Benefit Guaranty Corp. v. Heppenstall Co., 633 F.2d 293 (3rd Cir.1980), the Third Circuit noted there was no legislative history to aid in the resolution of the issue. Id. at 297. The Heppenstall court concluded, however, a district court's discretion in setting the date was not intended to be standardless. Id. at 297. Heppenstall stated a court, "must select the date which it determines is most consistent with the purposes of the insurance subtitle." Id. at 297.
 
 
 17
 This court will apply the Heppenstall standard. In adopting this standard, the courts should consider the statutorily mandated function of the PBGC. Those functions are:
 
 
 18
 (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,
 
 
 19
 (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and
 
 
 20
 (3) to maintain premiums established by the corporation under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.
 
 
 21
 29 U.S.C. § 1302(a)(1), (2), (3). The PBGC is also mandated by statute to ensure the interests of plan participants are protected as well. 29 U.S.C. § 1342(c).
 
 
 22
 In considering an appropriate termination date, the district court herein noted its goal was "to find a date that balances the interests of the plan participants with protecting the fund from overpayment." Pension Comm. for Farmstead v. Pension Ben. Guar. Corp., 778 F.Supp. 1020, 1025 (D.Minn.1991). In implementing this goal, the district court noted the Heppenstall decision, as refined in United Steel Workers of Am. v. Harris & Sons Steel Co., 706 F.2d 1289 (3rd Cir.1983) formulated a three step approach for the benefit of district courts. This approach requires the district court to: 1) identify the interests of all plan participants and the PBGC; 2) establish parameters which maximize those interests and 3) set the termination date accordingly. Pension Comm. for Farmstead, 778 F.Supp. at 1025 (quoting Harris & Sons Steel Co., 706 F.2d 1289, 1296 (3rd Cir.1983)). That procedure was followed by the district court.
 
 
 23
 Initially, the court identified the interests of the plan participants and the PBGC. Pension Comm. for Farmstead, 778 F.Supp. at 1026-27. The PBGC's liability is based on benefits an employee accrues during the viability of the pension plan. The longer a doomed plan exists, the more benefits qualified participants acquire, and, additional employees may become eligible for benefits. On the other hand, the employees have an interest in prolonged viability of the plan because PBGC's liability is fixed at the time of plan termination and, PBGC does not necessarily pay the same benefit the plan provides. See 29 U.S.C. § 1322 (the benefits guaranteed by the PBGC). The district court noted employers become liable to the PBGC for the amounts the PBGC pays out on the plans' behalf. Pension Comm. for Farmstead, 778 F.Supp. at 1026. 29 U.S.C. § 1362(b) (describes contributing sponsor's liability when PBGC initiates termination proceedings). There is, however, a limitation to an employers liability. If the amount paid out by the PBGC is greater then 30 percent of the employer's net worth as of the termination date, the amount owed to the PBGC is fixed at 30 percent of the employers net worth on that date. 29 U.S.C. § 1362(b)(2)(B).
 
 
 24
 Involuntary termination proceedings often involve business entities that are experiencing severe financial difficulty. The date fixed for termination can have severe financial consequences on the PBGC's, and the employer's liability. The date of termination fixes "the date beyond which, whether or not [plan participants] continue to work, they no longer accrue additional vested pension rights." Heppenstall, 633 F.2d at 301. Plan participants therefore have an interest in delaying the date of termination as long as possible. Plan participants and the PBGC have other interests, which the district court noted in its opinion. Pension Com. for Farmstead, 778 F.Supp. at 1026-27.
 
 
 25
 The second prong of the Harris & Sons Steel analysis requires a district court to set parameters for the selection of the termination date. Harris & Sons Steel, 706 F.2d at 1296. The district court set parameters and selected a range of possible termination dates. Pension Com. for Farmstead, 778 F.Supp. at 1027. The district court relied on the conclusion reached in Heppenstall that the justifiable expectation by a participant in a plan, of continued accrued benefits, is a significant factor in selecting a termination date. The district court noted that some jurisdictions have found plan participants justifiable expectation, of continued accrued benefits, terminate upon an employer's cessation of operations. Pension Com. for Farmstead, 778 F.Supp. at 1027 (citing In re Syntex Fabrics, Inc. Pension Plan, 698 F.2d 199, 201 (3rd Cir.1983); Heppenstall, 633 F.2d at 301; In re Maryland Glass Corp., 618 F.Supp. 1410, 1415 (D.C.Md.1985); Pension Benefit Guar Corp. v. Dickens, 535 F.Supp. 922, 925 (W.D.Mich.1982)). Based on those precedents, the district court found that the date each facility closed was the earliest date that it could terminate the Plans. Pension Com. for Farmstead, 778 F.Supp. at 1027. For CRM, that date was March 9, 1990 and for Cornbelt, March 20, 1990. Id. At the other end of the spectrum, based on the Unions' assertions, the district court found July 22, 1991, as the latest potential date for plan termination. Id. It was on this date that the PBGC had filed its motions with the district court for orders to show cause why both Plans should not be terminated. The Union argued that July 22, 1991, was the day on which the Plan participants lost any reasonable expectation of the continued viability of the plans. Id.
 
 
 26
 In the selection of a plan termination date the district court gave deference to the recommendation of PBGC. It concluded the dates proposed by PBGC, "adequately considers sufficient notification to the Plan participants and does not expose the PBGC to excess liability. Those dates balance the competing interests of the Plan participants and the PBGC as effectively as possible." Id. at 1027-28. The Unions argue the district court erred in affording deference to the recommendation the PBGC submitted as an appropriate termination date.
 
 
 27
 In United Steel Workers of Am. v. Harris & Sons Steel Co., 706 F.2d 1289 (3rd Cir.1983), the third circuit gave the PBGC recommendation of a termination date greater deference than that given in Heppenstall. It said:
 
 
 28
 Proper deference to the PBGC's choice of a termination date must be given. In Heppenstall we accorded the PBGC's suggested termination date merely "fair consideration." 633 F.2d at 301. There, however, the Court was influenced by the fact that the PBGC was attempting to limit its liability by the selection of a relatively early termination date. The Heppenstall court also took into account that the date there advocated by PBGC did not appear to be based on any interpretation of ERISA. Where the PBGC is interpreting Title IV of ERISA, and especially where the special facts of Heppenstall are not present, the views of the agency are due greater deference than the court accorded in Heppenstall.
 
 
 29
 Harris & Sons, 706 F.2d at 1296.
 
 
 30
 In the case now before this court, the district court appears to have followed the teaching of Harris & Sons, in according deference to the recommendation of PBGC. Pension Com., 778 F.Supp. at 1026. We agree. We hold that in situations where the PBGC is interpreting provisions of Title IV of ERISA, the recommendation proffered by the PBGC, should be accorded deference. Harris & Sons, 706 F.2d at 1296; see Connolly v. Pension Benefit Guar. Corp., 581 F.2d 729 (9th Cir.1978) (finding the determinations of the PBGC to be entitled to great deference in matters concerning the application of ERISA); Cf. Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union, 980 F.2d 465 (7th Cir.1992) (recognizing the concept that the views of the PBGC are normally accorded deference in interpretations of ERISA matters); Cf. Wise v. Ruffin, 914 F.2d 570 (4th Cir.1990) (not according a determination of the PBGC deference in an ERISA related matter but recognizing the agency is usually entitled to receive it).
 
 
 31
 The propriety of the dates ultimately selected is also at issue. The PBGC notified the CRM Pension Committee and the Cornbelt Pension Committee of its intention to institute involuntary termination procedures on February 7, 1991. In this notice, the PBGC proposed June 13, 1990, and October 1, 1990, as the respective termination dates for the CRM and Cornbelt plans. The PBGC's proposed termination dates were selected because they were the same dates the Plans proposed when they initiated voluntary distress termination proceedings pursuant to 29 U.S.C. § 1341. Thus, it was the rationale of the PBGC that plan recipients' reasonable expectation of continued accrued benefits would not exist past the date when their employer gave them written notice that it intended to terminate the pension plans.
 
 
 32
 The district court determined the filing by the Plans of a notice to terminate on proposed termination dates, and the subsequent reduction of participants' benefits to the level guaranteed by the PBGC, was the point at which plan participants' "reasonable expectation" in continued accrual of benefits would no longer be reasonable. The district court adopted those dates and the PBGC's support of those dates as the appropriate termination dates.
 
 
 33
 The Unions contend that the justifiable expectations of the plan participants did not terminate upon their receipt of the notice of proposed voluntary termination. The contention is based on the Unions' assertion that, in light of the arbitrators' decision the Plans were without legal authority to initiate termination proceedings without the consent of the Unions, and the notice was a legal nullity.
 
 
 34
 Courts must consider the justifiable expectation participants have in the continued accrual of their pension benefits. The employees of CRM were discharged and operations at the plant halted on March 9, 1990. The same occurred at Cornbelt on March 20, 1990. Courts have held that an employee receives constructive notice of a plan's termination when the employer ceases operation. Heppenstall, 633 F.2d at 301; In re Maryland Glass Corp., 618 F.Supp. 1410, 1415-16 (D.C.Md.1985); Pension Benefit Guaranty Corp. v. Dickens, 535 F.Supp. 922, 925 (W.D.Mich.1982). More then a month after the plants shut down and the employees were discharged, plan participants received notices from their employers that their pension plans were being terminated. After a plant had closed, a discharged employee, who had not been receiving paychecks from a former employer, would be very presumptuous in believing that pension benefits were continuing to accrue. This is true regardless of the provisions in a collective bargaining agreement.[5] The subsequent decision of an arbitrator, who in his decision admittedly gave no consideration to ERISA, does not retroactively revitalize a justifiable expectation in participants of a continued accrual of benefits.
 
 
 35
 The Unions concede Congress has authorized the PBGC to act as trustee in termination cases. See 29 U.S.C. § 1342(b)(1) (Supp.1985). Nevertheless, the Unions assert the appointment of the PBGC as trustee of the terminated plans constitutes an inherent conflict of interest. We find the argument to be without merit in light of the established precedent supporting the PBGC's appointment in this capacity.
 
 
 36
 On a review of the record, the comprehensive and well reasoned opinion of the district court is affirmed.
 
 
 
 *
 The Honorable Paul Benson, Senior United States District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 29 U.S.C. §§ 1001-1461
 
 
 [2]
 29 U.S.C. §§ 1301-1461
 
 
 [3]
 In 1991 the PBGC paid $ 516 million in benefits. At year-end in 1991, PBGC's deficit, which reflects it long-term obligation to pay benefits was more then $ 2.5 billion dollars
 
 
 [4]
 The Honorable David S. Doty, United States District Judge for the District of Minnesota
 
 
 [5]
 The district court noted, and we agree, that the collective bargaining agreements did not address plan termination. Pension Comm. for Farmstead, 778 F.Supp. at 1028. Thus, we do not agree with the Unions' assertion that the termination dates selected violate the collective bargaining agreements. The PBGC can terminate pension plans even if doing so would violate the provisions of a collective bargaining agreement. 29 U.S.C. § 1341(a)(3)