In re MARYLAND GLASS CORPORA-
TION NON–SALARIED EMPLOYEES'
PENSION PLAN, Maryland Glass Cor-
poration Salaried Employees' Pension
Plan.

PENSION BENEFIT GUARANTY
CORPORATION

v.

MARYLAND GLASS CORPORATION,
Dorsey Corporation, Chattanooga Glass
Company, American Flint Glass Work-
ers Union, AFL–CIO, and Glass Bottle
Blowers Association of the United
States and Canada, AFL–CIO.

Civ. A. No. M–81–1480.

United States District Court,
D. Maryland.

Oct. 7, 1985.

Edward R. Mackiewicz, Gen. Counsel,
James N. Dulcan, Asst. Gen. Counsel, Ste-
phen D. Schreiber, Trial Atty., Paul Green,
Atty., Washington, D.C. (Larry D. Adams,
Asst. U.S. Atty., Baltimore, Md., of coun-
sel), for Pension Benefit Guar. Corp.

Stephen M. Kimatian, Baltimore, Md.,
Trustee in Bankruptcy for Maryland Glass
Corp.

Michael E. Twomey and Olwine, Connel-
ly, Chase, O'Donnell and Weyher, New
York City, George W. White, Jr. and White,
Mindel, Clarke & Hill, Towson, Md., for
Dorsey Corp. and Chattanooga Glass Co.

Mary L. Crangle and Tomar, Parks, Seli-
ger, Simonoff & Adourian, Haddonfield,

N.J., Richard T. Tomar, Rockville, Md., for American Flint Glass Workers Union, AFL–CIO and Glass Bottle Blowers Ass'n of the U.S. and Canada, AFL–CIO.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

On June 11, 1981, Pension Benefit Guaranty Corporation (PBGC) filed an action under Title IV of ERISA, 29 U.S.C. § 1301 *et seq.*, for an order terminating the Maryland Glass Corporation Non-Salaried Employees' Pension Plan and the Maryland Glass Corporation Salaried Employees' Pension Plan and appointing PBGC as statutory trustee of the Plans pursuant to 29 U.S.C. § 1341(c). Also named as defendants were Chattanooga Glass, a former owner of Maryland Glass, and Dorsey Corporation which owned Chattanooga Glass (Paper No. 1).

The Glass Bottle Blowers Association of the United States and Canada, AFL–CIO, moved for leave to intervene as a defendant in this action pursuant to Fed.R.Civ.P. 24(a)(2) or (b)(2) (Paper No. 9). American Flint Glass Workers Union, AFL–CIO, also moved for leave to intervene as defendant (Paper No. 12).

On April 7, 1983, this court stayed all proceedings as a result of a suggestion of bankruptcy filed by Maryland Glass (Paper No. 16). On October 10, 1984, the stay was lifted and this court granted the right to intervene to Glass Bottle Blowers Association (GBBA) and American Flint Glass Workers Union (AFGWU) (Paper No. 26).

Subsequently, cross-motions for summary judgment were filed by PGBC (Paper Nos. 34 & 40); GBBA and AFGWU (Paper No. 33); and Chattanooga and Dorsey (Paper Nos. 35 & 39). PBGC opposed the motions filed by the other parties (Paper No. 36). Similarly, oppositions to PBGC's motion for summary judgment were filed by GBBA and AFGWU (Paper No. 37) and by Chattanooga and Dorsey (Paper No. 38). No hearing is necessary to decide the issues presented in the motions. Local Rule 6(G).

## Factual Background

The main issue in this case involves the date on which PBGC may terminate retroactively the two pension plans of Maryland Glass Corporation [hereinafter the Union Plan and the Salaried Plan]. The undisputed facts relevant to that issue are set forth here.

Chattonooga Glass Company, a wholly owned subsidiary of Dorsey Corporation, operated a glass container manufacturing plant in Baltimore under the name of Maryland Glass. The GBBA and AFGWU represented bargaining units of employees of the plant under collective bargaining agreements in effect at all pertinent times. In late October, 1978, the assets of Chattanooga's Baltimore plant were sold to Stephen Kelly, as Kelly Glass. Soon thereafter, the corporate name was changed back to Maryland Glass. The name "Maryland Glass Corp." hereafter refers to the new Maryland Glass, formed after the Kelly interests acquired the assets of the original Maryland Glass Corp.

Shortly before that sale, Dorsey and PBGC entered into an Indemnity Agreement. Apparently PBGC was concerned at that time about the financial solvency of the two pension plans. The Indemnity Agreement (Paper No. 38, Ex. 2) allowed Chattanooga to sell the Baltimore plant to Maryland Glass; allowed Maryland Glass to adopt the two pension plans; and provided that Dorsey would be liable to PBGC for the combined underfunding of the plans if the date of termination for the plans fell within two years after the closing of Chattanooga's agreement to sell the Baltimore plant. If the date of termination were to fall after the end of the second year and before the end of the third year after the date of closing, Dorsey would be liable for one-third of the amount of underfunding (Paper No. 38, Ex. 2 at ¶¶ 5–6).

The closing for the sale of the plant took place on or about October 25, 1978. At that time, under the terms of the Sales Agreement, Kelly Glass, subsequently named Maryland Glass, agreed to adopt

and continue the Union Plan and the Salaried Plan (Paper No. 34, Ex. C at 8-1). Those plans are tax qualified, defined benefit pension plans covered by Title IV of ERISA (Paper No. 34, Ex. C at 8-1, 8-2 & 8-3). Kelly Glass, subsequently known as Maryland Glass, also agreed, under the terms of the Sales Agreement, that it would not terminate the plans during the current year or during the next five full years (Paper No. 34, Ex. C at 8-7 & 8-8). Finally, Kelly Glass, subsequently known as Maryland Glass, promised that it would not agree to a termination date for the plans which was retroactive and prior to January 1, 1983 (Paper No. 34, Ex. C at 8-8).

Shortly after the October 25th closing date, extensive plant renovation began. Manufacturing operations began in June, 1979. Suffice it to say that for numerous reasons, the new Maryland Glass experienced setbacks which caused severe financial problems. On October 31, 1979, Maryland Glass filed a petition for arrangement under Chapter 11 of the Bankruptcy Code (Paper No. 34, Ex. H at 10, 11 and Ex. E), and for some time thereafter operated as debtor-in-possession.

Maryland Glass' financial problems affected its ability to make scheduled contributions to the pension plans. On September 8, 1980, just one week before the September 15th contribution was due for payment, Maryland Glass requested that the Internal Revenue Service waive that contribution requirement because of the financial hardship it would cause the company (Paper No. 34, Ex. F at 5). Maryland Glass did not make the September 15th contribution to the pension plans.

In December, 1980, Maryland Glass began to lay off its union employees (Paper No. 38, Ex. 15). It shut down its furnace and plant operations on February 25, 1981 (Paper No. 35, Affidavit of Twomey ¶ 24; Paper No. 34, Finkelstein Affidavit ¶ 18). Some salaried employees continued to work at the plant, apparently to supervise the selling of inventory and general plant maintenance (Paper No. 34, Finkelstein Affidavit ¶ 18).

By letter dated April 12, 1981, PBGC suggested to Maryland Glass that the pension plans should be terminated by Maryland Glass voluntarily (Paper No. 38, Ex. 24). Ten days later, on April 24, 1981, the Chapter 11 bankruptcy proceeding was converted to a Chapter 7 liquidation proceeding (Paper No. 34, Ex. E), and Maryland Glass subsequently was adjudicated bankrupt.

Maryland Glass, however, did not voluntarily choose to terminate the pension plans. Therefore, PBGC, by letter of May 15, 1981, notified Maryland Glass, Dorsey, Chattanooga, GBBA, and AFGWU of its intent to seek an involuntary termination of the plans, retroactive to September 15, 1980, the date Maryland Glass failed to pay the pension plans contribution, and to request that the court appoint it as statutory trustee for the pension plans (Paper No. 38, Ex. 27).

The parties do not contest the involuntary termination. They do contest, however, the retroactive date of September 15, 1980 which PBGC set for termination. Dorsey and Chattanooga claim February 25, 1981, the date the furnaces at Maryland Glass were shut down and most employees laid off, as the earliest date for retroactive termination. GBBA and AFGWU argue that April 23, 1981, the date the last remaining employees were laid off, should be found to be the date of termination.

## Legal Analysis

A. *Significance of the Termination Date Dispute*

"A plan's termination date is significant .... [T]ermination marks the date on which benefits of plan participants cease to accrue. For involuntary terminations, the date of termination serves an additional purpose. When an employer underfunds its pension plan and is unable to finance a minimum level of benefits, PBGC, pursuant to its statutory guarantee, must pay those benefits. If forced to honor its guarantee, PBGC has the right [under the statute, 29

U.S.C. § 1362(b) ] to recover from the employer the lesser of the amount that the employer underfunded its plan or thirty percent of the employer's net worth on a date chosen by PBGC within 120 days prior to the plan's termination date. Because involuntary termination proceedings often involve bankrupt corporations with deteriorating financial resources, the date of termination can significantly affect the extent of PBGC's recovery from the employer." *Pension Benefit Guaranty Corp. v. Broadway Maintenance Corp.,* 707 F.2d 647, 649 (2d Cir.1983) [hereinafter *Broadway Maintenance* ].

In the case at bar, the date of termination specifically affects PBGC's extent of recovery from Dorsey and Chattanooga. Under the Indemnity Agreement signed by Dorsey and Chattanooga prior to the sale of its plant to the new Maryland Glass, Dorsey assumed liability to PBGC for the combined underfunding of both plans if the date of termination fell within two years of October 25, 1978. If, however, the termination date fell after the end of the second year and before the end of the third year after that October 25, 1978 closing date, Dorsey agreed to pay one-third of the amount of underfunding of both pension plans. PBGC's proposed termination date of September 15, 1980 falls within two years of October 25, 1978, and would make Dorsey liable for the full amount of the combined underfunding of the plans.

The date proposed by Dorsey and Chattanooga, February 25, 1981, as well as the April 23, 1981 date proposed by the unions, falls after the second but before the end of the third year, limiting Dorsey's liability to one-third of the combined underfunding. It appears from the record that the combined underfunding is approximately seven million dollars (Paper No. 34, Affidavit of Finkelstein ¶¶ 10 & 14; Ex. P).

The date of April 23, 1981 proposed by the two unions maximizes the benefits which accrue to the employees of Maryland Glass under the pension plans. The longer the pension plan is deemed to have been in existence, the higher the benefits will be.

In addition, vesting of some participants also will have occurred during the disputed period.

Thus, each party has a strong interest in having its date chosen as the date of termination.

### B. Choosing a Termination Date

PBGC, a self-financing insurance program, guarantees pension plan participants a certain minimum level of benefits if their employers terminate pension plans with inadequate funds. *See Broadway Maintenance,* 707 F.2d at 648, 29 U.S.C. § 1332(a). Pension plans may be terminated voluntarily by the plan administrator, 29 U.S.C. § 1341(a), but ERISA also provides that PBGC may initiate involuntary termination procedures when:

    (1) the plan has not met the minimum funding standard required under Section 412 of the Internal Revenue Code,

    (2) the plan is unable to pay benefits when due,

    (3) a substantial distribution of plan assets was made to a participant who is a subtantial owner of the company sponsoring the plan, and

    (4) the BPGC faces an unreasonable increase in its liabilities if the plan is not terminated.

*See* 29 U.S.C. § 1342(a).

None of the parties herein disputes that PBGC legally is correct to seek involuntary termination in this case. "But Congress did not give PBGC unilateral authority to set a termination date, even in involuntary proceedings. Under ERISA, if the plan administrator does not agree to the date proposed by PBGC in an involuntary termination proceeding, a federal district court will set the date." *Broadway Maintenance,* 707 F.2d at 649; 29 U.S.C. § 1348(a)(3). The plan administrator herein has not agreed to a termination date.

In *Pension Benefit Guaranty Corp. v. Heppenstall Co.,* 633 F.2d 293 (3d Cir.1980) [hereinafter *Heppenstall* ], the first case to consider and define the analysis a district court should utilize in setting a disputed

termination date, the Third Circuit established that "the court must select the date which it determines is most consistent with the purposes of the insurance subtitle." *Id.* at 297.

The statute addresses the purposes to be accomplished by involuntary termination—"to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c).[1] *Heppenstall* set forth an approach by which those purposes could be accomplished.

■ The Third Circuit in a later opinion stated, "*Heppenstall* proposed a three part analysis for ascertaining the termination date: '[first] identify the interests of all the plan participants and the PBGC, [second] establish the parameters which maximize those respective interests, and [third, within the limits of the statute] set the termination date accordingly.'" *United Steelworkers of America v. Harris & Sons Steel Co.*, 706 F.2d 1289, 1296 (3d Cir.1983) (quoting *In re Braniff Airways, Inc.*, 24 B.R. 466, 472 (Bankr.N.D.Tex.1982), which utilized the *Heppenstall* approach).

■ This court will adopt the *Heppenstall* approach as have other courts facing the issue of setting a termination date. *See, e.g., Broadway Maintenance*, 707 F.2d at 652–53; *In re Braniff Airways, Inc.*, 24 B.R. at 472; *Pension Benefit Guaranty Corp. v. Dickens*, 535 F.Supp. 922, 925–26 (W.D.Mich.1982), *aff'd. sub. nom. on other grounds, In Re Challenge Stamping & Porcelain Co.*, 719 F.2d 146 (6th Cir.1983).

### 1) *Interests of Participants and PBGC*

The interest of PBGC can be identified briefly as protecting its resources against increased liability. Clearly, if Dorsey were made to pay the full amount by which the

plan is underfunded, PBGC's interest would be fully satisfied.

On the other hand, the interests of the participants are more varied. As pointed out in *Heppenstall*, both retirees' and employees' interests must be considered. *Heppenstall*, 633 F.2d at 301.

"The termination date affects retirees only to the extent that the payments guaranteed under ERISA [may be] less than they are currently receiving, or to the extent that benefits already received may be recaptured under 29 U.S.C. § 1345." *Id.* As of January 1, 1979, of the 493 participants in the Union Plan, 152 were retirees receiving benefits (Paper No. 38, Ex. 25 at 2). In the Salaried Plan, 56 of the 100 participants were retirees (Paper No. 38, Ex. 26 at 2).

There is no evidence in the record regarding the impact of PBGC's proposed termination on retirees, but it can be assumed that those 208 retirees will feel some greater or lesser financial impact depending on the termination date chosen. The later the date chosen, the less the impact. "The termination date affects employees in ... a different way [from retirees] by fixing the date beyond which, whether or not they continue to work, they no longer accrue additional vested pension rights." *Heppenstall*, 633 F.2d at 301.

As of January 1, 1979, all but 42 employees of the 493 participants in the Union Plan were vested (Paper No. 38, Ex. 25 at 30–44; Paper No. 34, Affidavit of Finkelstein ¶ 16). According to PBGC, between 7 to 9 of those 42 participants would vest between September 15, 1980 and April 23, 1981 (Paper No. 34 at 30–31; Affidavit of Finkelstein ¶¶ 15, 16). Because, under ERISA, only vested benefits are guaranteed by PBGC, 29 U.S.C. § 1322(a), those 7 to 9 employees would not be covered by PBGC if the September 15, 1980 date were chosen.

---

**1.** At the time *Heppenstall* was decided, the statute was written using the conjunctive "and," *i.e.*, "to protect the interests of the participants *and* to avoid any further deterioration...." *Heppenstall*, 633 F.2d at 300 (emphasis added). The

use of the disjunctive "or" in the amended § 1342(c) may indicate that Congress was aware that the interests of the participants would sometimes be in conflict with the interests of PBGC. Such is the case herein.

Under the Salaried Plan, PBGC states that none of the approximately 13 non-vested participants would vest between September 15, 1980 and April 23, 1981 (Paper No. 34 at 31; Affidavit of Finkelstein ¶¶ 15, 16). Thus, choosing the September 15, 1980 date as the termination date would not affect participants of the Salaried Plan.

Participants of both plans continued to work for Maryland Glass from September 15, 1980 to April 23, 1981, although that work force was reduced considerably on February 25, 1981 when the furnaces were shut down. Use of the September 15, 1980 date would mean that pension benefits of those employees would be computed without regard to that additional period of employment (Paper No. 34, Affidavit of Finkelstein ¶ 15).

### 2) *Setting the Parameters*

When the *Heppenstall* court considered the interests of the employees, it focused not merely on the extent of the monetary impact on employees of a termination date, but looked closely at the expectation and reliance interest of the employees in the pension plan. As the court pointed out, as vested employees work they accrue additional vested pension rights which are insured to them under ERISA. 633 F.2d at 301. Thus, *Heppenstall* concluded that "the earliest date which could properly be selected by the court is that date on which participant employees had some reasonable notice that PBGC was seeking termination and thus they no longer had a justifiable expectation in the accrual of vested pension rights." 633 F.2d at 302.

The three proposed dates should be examined, therefore, to determine the earliest date on which the employees received some reasonable notice of plan termination. PBGC's date of September 15, 1980, the date on which Maryland Glass failed to pay the required pension plan contributions, does not appear to be an appropriate date of notice to employees. While there is some indication in the record that the unions were notified orally that Maryland Glass had not made the contribution (*see*

Paper No. 38, Finkelstein Deposition 140–42, 150–55), that event, absent more, would not be expected to alert employees that their pension plans would be terminated.

The Internal Revenue Code specifically provides a procedure by which payment of the plan contribution for reasons of substantial business hardship can be waived. 26 U.S.C. § 412(d). In fact, when Maryland Glass requested the waiver, it stated in its request to the IRS, "The imposition of the funding standard would likely result in a termination of the Plan." (Paper No. 34, Ex. F at 5).

Therefore, even if the unions were told of the waiver request and the failure to pay the required contribution, they could not have been put on notice that such failure would precipitate plan termination, particularly given Maryland Glass' representation to the IRS that *payment* of the funding standard amount could result in termination.

On the February 25, 1981 date proposed by Dorsey and Chattanooga, Maryland Glass shut down its furnace and plant operations. By that date, most of the union employees had been laid off (Paper No. 38, Ex. 15 showing 24 union employees working as of 12/29/80). Salaried employees, apparently, remained on staff and working.

Several courts have held that the employees have at least constructive notice of plan termination on the date the employer ceases operation. *See, e.g., In Re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 201 (3rd Cir.1983); *Heppenstall*, 633 F.2d at 301; *Pension Benefit Guaranty Corp. v. Dickens*, 535 F.Supp. at 925. Whether cessation must be total in the fullest sense of that word has not been addressed by those courts.

In the case at bar, although the February 25th shutdown did not represent complete cessation of company operations, plant production obviously was brought to a standstill. The remaining salaried employees, it appears, supervised the sale of inventory and plant maintenance (Paper No. 34, Finkelstein Affidavit ¶ 18).

The union argues that it was not until April 23, 1981 when all employees were laid off and liquidation of Maryland Glass became a fact that employees received actual notice of plan termination. Under the circumstances, however, it appears that February 25, 1981 represents the date the company ceased production. When the furnace shut down so too did Maryland Glass, for all intents and purposes relevant to the notice issue. Therefore, the court will establish February 25, 1981 as the date on which the employees had notice of plan termination.

### 3) *Setting the Date*

Having established that employees had notice of plan termination no earlier than February 25, 1981, *Heppenstall* compels the conclusion that no earlier date, for example PBGC's September 15, 1980 date, can be set for termination. It further follows that setting a date later than February 25, 1981 would adversely affect PBGC's interests by exposing it to increased liability.

The date of February 25, 1981 considers and balances the competing interests of the plan participants and PBGC as effectively as possible.

■ The court recognizes that setting that date for plan termination exposes PBGC to liability for two-thirds of the underfunding of the plans. That represents a significant sum of money, but protection of plan participants is the central focus of ERISA. This court agrees with *Heppenstall* and the cases applying *Heppenstall* that protection of plan participants requires reasonable notice to them of plan termination.

### C. *Plan Trustee*

■ Dorsey and Chattanooga object to the appointment of PBGC as trustee of the pension plans.

Whenever PBGC seeks involuntary termination of a pension plan, it may apply to the district court for appointment of a trustee. 29 U.S.C. § 1342(b)(1). PBGC has petitioned that it be appointed trustee of the plans.

Objection to such appointment rests on the dispute herein over the termination date. Because a trustee must serve the interests of the plan participants, 29 U.S.C. § 1342(b)(2), Dorsey and Chattanooga conclude that PBGC's interest in an earlier termination date puts it in conflict with the plan participants. Those respondents, however, state in a later motion that "until a termination date is established by this court, the PBGC is incapable of adequately representing the interests of the ... plan participants and should not be appointed trustee of the Plans." (Paper No. 38 at 27).

This court, having established a termination date, and thus having eliminated the sole source of conflict between the participants and PBGC, will appoint PBGC as trustee of the Plans.

Accordingly, it is this 7th day of October, 1985, by the United States District Court for the District of Maryland, ORDERED:

1. That the termination date of the pension plans herein is set as February 25, 1981.

2. That PBGC is appointed trustee of those pension plans.

3. That the above decisions represent a granting in part and a denial in part of all summary judgment motions filed herein.

4. That the Clerk enter a judgment order closing this case.