**George E. BERARD and Joao S. Almeida, on behalf of themselves and the class of all others similarly situated, Plaintiffs,**

v.

**ROYAL ELECTRIC, INC., Royal Electric, Inc. Retirement Plan for Salaried Employees, Martin Wright, Jordan Wright, FL Industries, Inc., and FL Industries, Inc. Retirement Plan for Salaried Employees, Defendants.**

Civ. A. No. 90–367B.

United States District Court, D. Rhode Island.

June 9, 1992.

Joseph V. Cavanagh, Blish & Cavanagh, Providence, R.I., for plaintiffs.

Jeffery Schreck, Flanders & Mederios, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

FRANCIS J. BOYLE, Chief Judge.

This class action is brought pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1988), on behalf of certain participants in an employee pension benefit plan. The plaintiffs originally sought relief from Royal Electric, Inc.; The Royal Electric, Inc. Retirement Plan for Salaried Employees; Martin Wright and Jordan Wright for their failure to establish and fund a pension plan with early retirement benefits. In April, 1991, plaintiffs amended their complaint, adding FL Industries, Inc. and the FL Industries, Inc. Retirement Plan for Salaried Employees (FL Plan) as defendants. FL Industries, Inc. and the FL Plan are now the sole defendants. The plaintiffs claim that FL Industries and the FL Plan wrongfully terminated their right to future benefit accruals and improperly reduced early retirement benefits accrued by them.

## FACTS

International Telephone and Telegraph owned and operated a business known as the Royal Electric Division (Royal Electric) in Pawtucket, Rhode Island. On June 28, 1985, FL Industries, pursuant to an asset purchase agreement, purchased Royal Electric and 11 other ITT industrial divisions.

The purchase agreement required FL Industries to establish a retirement plan, the FL Plan, to secure the pension benefits of former ITT employees. The FL Plan provided retirement benefits identical to those provided by the former ITT plan. The FL Plan was funded in accord with Internal Revenue Code, 26 U.S.C.A. § 414(1) (1988), and regulations implementing that section, by "spinning off" a portion of the assets from the ITT plan and transferring them to the FL Plan. FL Industries retained the actuarial firm of Frank B. Hall & Company to advise it of the funds necessary to fully fund its plan. Mr. Harvey Pasternack, enrolled actuary at Frank B. Hall, advised FL Industries that the funds required to fully fund the FL Plan equaled the total actuarial value of all the liabilities of the ITT Plan to be assumed by the FL Plan. Mr. Pasternack assessed ITT's liabilities to be approximately $23,500,000.00. In reliance on that advice, FL Industries accepted the sum of $24,500,000.00 to fund its new retirement plan. After the asset transfer, the FL Plan assumed the liabilities of the ITT plan to pay pension benefits to those ITT employees who became FL Industries employees due to the sale.

Under the FL Plan, accrued normal retirement benefits were based upon a percentage of the final average compensation multiplied by the number of years of service credited to a participant for purposes of benefit calculations. Retirement age under the Plan was age 65. Additionally, the Plan provided two types of early retirement benefits: "Standard Early Retirement," available at age 55 with 10 years of service, and "Special Early Retirement," available at age 55 with 15 years of service. An early retiree with requisite age and service could elect to receive monthly retirement payments at age 65 or at an earlier time. Standard Early Retirement payments starting before age 65 were reduced by 3% per year for each year before age 65. Special Early Retirement payments commencing before age 60 were reduced by 5% per year for each year before age 60, and Special Early Retirement payments starting at or after age 60 were not reduced at all.

On April 18, 1986, FL Industries sold the assets of Royal Electric to Royal Technologies. The Asset and Purchase Agreement provided that the "Buyer [Royal Technologies] shall, on and as of the Closing Date, assume all of the obligations of Seller [FL

Industries] with respect to all of the compensation, employee benefit and related programs relating to Business' Employees (sic) including, but not limited to, pension benefits...." The agreement also required FL Industries to transfer all assets and liabilities of the FL Plan to the new Royal Technologies plan.

Royal Electric employees were notified of the sale and informed of basic changes in their retirement benefits. The employees received a memorandum dated April 28, 1986, stating that "monthly cash payment pension benefits provided through the Salaried Retirement Plan, [the FL Plan], will initially be computed using the same benefit formula presently in existence until a detailed analysis is made of all plan provisions." FL Industries, by letter dated April 22, 1986, also informed the employees that they were no longer FL Industries employees and, therefore, no longer entitled to certain retirement benefits provided by it.

The Asset and Purchase Agreement required Royal Technologies to establish a qualified pension plan to secure pension benefits for Royal Electric employees. As an accommodation, FL Industries agreed to continue managing the benefits of Royal Electric employees until the new Royal Technologies plan received approval from the Internal Revenue Service. The Royal Technologies plan was to be funded by "spinning off" certain assets of the FL Plan as had been done previously between ITT and FL Industries. This time, however, the asset transfer was plagued by two major problems.

First, Royal Technologies did not establish a qualified pension plan until December 31, 1988, even though its Board of Directors voted in December, 1986, to adopt a retirement plan that would be the "mirror-image" of the FL Plan. The actual plan adopted by Royal Technologies, however, was not a "mirror image" of the FL Plan. The new Royal Plan did not provide for the accrual of early retirement benefits after April 26, 1986.

Second, the FL Plan did not have sufficient funds available to cover the accrued benefits of Royal Electric employees. The root cause of this insufficiency was traced back to an actuarial miscalculation of the amount of assets required to be spun off from the ITT plan and transferred the FL Plan. As a result of this miscalculation, the FL Plan was underfunded and did not have the required assets to transfer to Royal Technologies' Plan[1]. Litigation ensued.

On October 12, 1988, the parties reached a settlement which required an amendment to the asset purchase agreement. The amendment provided that "the Buyer [Royal Technologies] shall not assume any obligations of Seller [FL Industries] with respect to the Retirement Plan for Salaried Employees [FL Plan] of FL Industries, Inc. (the 'Salaried Plan'), as to Business' Employees; and Seller shall not be obligated to, and shall not, transfer any assets of the Salaried Plan to Buyer's qualified Plan for said employees." The amendment was retroactive to April 26, 1986. To meet its obligation to those Royal Electric employees who had participated in the FL Plan, FL Industries purchased a group annuity contract from Lincoln National Insurance Company which provided retirement benefits to those employees whose benefits had vested and accrued as of April 26, 1986. The annuity, however, did not fund early retirement benefits which had not vested on or before April 26, 1986.

Between April 26, 1986, the closing date of the sale to Royal Technologies, and October 12, 1988, the date of the settlement agreement, retirement benefits for Royal Electric employees were calculated under the FL Plan. During this period, both Royal Technologies and FL Industries participated in the administration of the pension plan for Royal Electric Employees. All

---

1. ERISA provides that "a pension plan may not ... transfer its assets or liabilities to, any other plan ... unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the ... transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the transfer...." 29 U.S.C.A. § 1058 (1988).

benefits paid to retirees were paid from the FL Plan. After April 26, 1986, certain Royal Electric salaried employees retired under the early retirement provisions of the FL Plan, receiving credit for service of employment during Royal Technologies' ownership.

In October, 1988, Royal Technologies sold Royal Electric to LW Industries, Inc. (LW Industries), a corporation owned by members of the Wright Family, principally defendants Martin and Jordan Wright. Royal Electric subsequently changed its name to Royal Electric, Inc., but remained the same corporate entity. Jordan Wright, in a memorandum dated November 14, 1988, informed the employees that pursuant to a settlement agreement between FL Industries and Royal Technologies, FL Industries would provide retirement benefits to those employees who were participants in the FL Plan on or before April 26, 1986. Mr. Wright's memorandum stated that the FL Plan terminated on that date.

In March, 1988, FL Industries began reducing the benefits of retired salaried employees to reflect only those benefits accrued on or before April 26, 1986. On March 30, 1989, FL Industries sent letters to William Weed, Jr., Margie Anderson, and John Lipe, each of whom received retirement benefits based, in part, on credit for service after April 26, 1986, informing them that the amount of their monthly pension payments would be reduced to reflect the elimination of this credit. On the same day, FL Industries informed Royal Technologies that "benefits currently being paid from the FL Plan include benefits that would have accrued had an identical plan been adopted by the new Royal owners. Accordingly, Royal Electric as successor to Royal Technologies, owes the FL Plan for the accumulated value of benefits paid in excess of FL's obligations. Any accruals after the sale date are the responsibility of Royal Electric and a new Royal Electric Plan." On or about April 17, 1989, the salaried employees were informed that *all* retirement benefits terminated as of De-

cember 31, 1988, and that early retirement benefits would be provided only to those participants who qualified for such benefits on April 26, 1986. At the time Royal Technologies acquired Royal Electric, neither of the named plaintiffs in this action had met the age requirements for eligibility and vesting early retirement benefits under the FL Plan.

At trial, plaintiffs' expert, Franklin Peters, testified as to the actuarial value of early retirement subsidies as calculated under the FL Plan's benefit formula. Peters defined the early retirement subsidy as "an additional benefit or additional value of benefit which becomes involved when a person takes early retirement. In other words, the early retirement subsidy is the excess of the value of the early retirement benefit over the regular benefit at normal retirement age." For those salaried employees who became eligible for early retirement between April 26, 1986, and October 12, 1988, by meeting the age and service requirements, Peters stated that the present value of the early retirement subsidy is $376,000.00.[2] For the one individual who became eligible for early retirement benefits between October 12, 1988, and December 31, 1988, the present value of the early retirement subsidy was calculated to be $54,000.00.

Peters also testified as to the actuarial valuation of accrued benefits. "Accrued benefits", Peters stated, "is (sic) the basic benefit which would be payable to the participant at normal retirement age." For the period from April 26, 1986, through December 31, 1988, Peters found the present value of the accrued benefits to be $800,000.00. For both the accrued benefits and the early retirement subsidy, Peters based his calculations on the assumption that the FL Plan remained in existence beyond April 26, 1986.

On February 7, 1991, Royal Electric, Inc. filed a petition under Chapter 11 in the United States Bankruptcy Court for the

---

**2.** Peters used October 12, 1988 as termination date for the accrual of benefits under the FL Plan because that was the date that FL Indus-

tries and Royal Technologies reached a settlement concerning the transfer of assets from the FL Plan to the Royal Plan.

Southern District of New York. On June 21, 1991, a petition under Chapter 11 was filed against Martin Wright in the same court. As a result, this action is stayed as to these parties.

On the second day of this trial, November 6, 1991, plaintiffs settled with Royal Technologies. The only issue remaining for decision is FL Industries' obligation for retirement benefits which accrued after the sale of Royal Electric to Royal Technologies.

## DISCUSSION

 Congress enacted ERISA to ensure that an employee would not lose fully vested, accrued benefits in the event the employer terminated its pension plan. *Nachman Corp. v. PBGC*, 446 U.S. 359, 374–75, 100 S.Ct. 1723, 1732–33, 64 L.Ed.2d 354 (1980). ERISA, however, does not require a plan sponsor to pay benefits which are not vested or accrued at the time a plan terminates. *West v. Greyhound Corp.*, 813 F.2d 951, 955 (9th Cir.1987). The plaintiffs claim that because FL Industries continued to administer the benefits accruing to Royal Electric employees they were entitled to accruals under the FL Plan which occurred after the sale to Royal Technologies. The plaintiffs further claim that they were entitled to unreduced early retirement benefits which vested after FL Industries sold Royal Electric to Royal Technologies.

 Generally, a pension plan participant may not accrue or become vested in pension benefits if the plan terminates. *See Blessitt v. Retirement Plan for Emp. of Dixie Eng. Co.*, 848 F.2d 1164, 1172 (11th Cir.1988). The principal issue is whether the FL Plan terminated when FL Industries sold Royal Electric to Royal Technologies.

### A. *Termination of Plan*

ERISA provides no guidelines to determine when a plan terminates.[3] *In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 201 (3d Cir.1983). The Third Circuit

**3.** ERISA, however, does dictate under 29 U.S.C.A. §§ 1341 and 1342 the procedure for

has suggested a test which uses notice of termination to determine when a plan terminates. *Id.* A District Court has relied on the factors determining the date of merger/spinoff under 26 C.F.R. 414(1)—1(b)(11) as guidelines for establishing plan termination dates. *Bass v. Retirement Plan of Conoco, Inc.*, 676 F.Supp. 735 (W.D.La.1988). First, we turn to the notice test.

### *Notice*

 An employee does not have a justifiable expectation of receiving benefits from a retirement plan once that employee receives reasonable notice, actual or constructive, of the plan's termination. *Blessitt*, 848 F.2d at 1173; *In re Pension Plan for Employ. of Broadway Maintenance Corp.*, 707 F.2d 647, 652 (2d Cir.1983); *Syntex Fabrics*, 698 F.2d at 201; *Pension Benefit Guar. Corp. v. Heppenstall Co.*, 633 F.2d 293, 302 (3d Cir.1980). Actual notice is obviously notice explicitly stating the date of plan termination. *Syntex Fabrics*, 698 F.2d at 201. Constructive notice is information which would lead a plaintiff to reasonably concluded that the plan was terminated. *See In re Pan American World Airways, Inc. Co-op. Retirement Income Plan*, 777 F.Supp. 1179, 1184 (S.D.N.Y.1991). Constructive notice of plan termination is established when the employer ceases operations. *Heppenstall*, 633 F.2d at 301; *In re Maryland Glass*, 618 F.Supp. 1410, 1415 (D.C.Md.1985); *Pension Benefit Guar. Corp. v. Dickens*, 535 F.Supp. 922, 925 (W.D.Mich.1982).

 Here, the plaintiffs must be charged with constructive notice of the plan's termination because FL Industries ceased operations with respect to Royal Electric when it sold the company to Royal Technologies. The plaintiffs were no longer FL Industries employees, and, thus, they could not justifiably expect to continue accruing retirement benefits from an employer for whom they no longer worked. *See Heppenstall*, 633

terminating a single-employer pension plan.

F.2d at 301 (no justifiable expectation of termination later than date employer ceased all operations). The FL Plan itself clearly states in section 3.02(b) that only eligible employees of FL Industries may accrue benefits under the FL Plan.

Additionally, Royal Electric employees received a memorandum dated April 28, 1986, which stated that Royal Technologies, *not* FL Industries, would continue to compute pension benefits according to the formula employed under the FL Plan until a detailed analysis of the Plan's provisions was complete. Furthermore, FL Industries informed the employees that 30 days after the sale certain retirement benefits previously provided by it would no longer be available. These communications provided enough information from which plaintiffs could have reasonably concluded that they would no longer accrue benefits under a retirement plan sponsored by FL Industries unless they exercised their rights within 30 days of the sale. It is of little significance that actual notice of termination was not received until November 14, 1988, since the employees were placed on constructive notice of termination as early as April 28, 1986, 10 days after the closing date.

Plaintiffs also argue that they should have received written notice of any amendment to the FL Plan within 15 days of such amendment. *See* 29 U.S.C.A. § 1054 (West.Supp.1991). This particular statutory provision is of no help to plaintiffs since it concerns plan amendments rather than terminations. In plan termination situations, constructive notice, which plaintiffs had, is all that is necessary.

### *Date of Termination based on Merger/Spin off Factors*

In *Bass*, 676 F.Supp. 735 (W.D.La. 1988), the court applied the factors outlined in Internal Revenue Code 26. C.F.R. § 1.414(1)–1(b)(11) to determine the termination date of the Conoco's pension plan. 676 F.Supp. at 748. The regulation provides:

(11) Date of Merger or Spinoff.

The actual date of a merger or spinoff shall be determined on the basis of the facts and circumstances of the particular situation. For purposes of this determination, the following factors, none of which is necessarily controlling, are relevant:

(i) The date on which the affected employees stop accruing benefits under one plan and begin coverage and benefit accruals on another plan.

(ii) The date as of which the amount of assets to be eventually transferred is calculated.

(iii) If the merger or spinoff agreement provides that interest is to accrue from a certain date to the date of actual transfer, the date from which such interest will accrue.

Treas.Reg., 26 C.F.R. § 1.414(1)–1(b)(11) (1991).

Plaintiffs do not dispute the following relevant facts. First, the Asset Purchase Agreement provided that all assets and liabilities of the FL Plan were to be transferred to the new Royal Technologies Plan within a specified time period after the sale. The transfer did not occur, and the Asset Purchase Agreement was amended to relieve Royal Technologies of liabilities that accrued under the FL Plan prior to the sale and to eliminate FL Industries' obligation to transfer assets of the FL Plan to the Royal Technologies plan. The amendment clearly required that the FL Plan would be obligated to pay those pension benefits which accrued before the sale but not those which accrued thereafter. As a result, Royal Electric employees ceased to accrue benefits under the FL Plan on April 26, 1986.

Second, FL Industries' benefit liability under the FL Plan was calculated up to April 26, 1986. Benefit liability means benefits owed employees or their beneficiaries under a retirement plan. *See* 29 U.S.C.A. § 1301(a)(16) (West Supp.1991). In order to satisfy its liabilities under the FL Plan, FL Industries bought and transferred to Royal Technologies an annuity from Lincoln National Insurance Company. This annuity reflected the FL Plan's liability to Royal Electric employees for accrued benefits calculated through April 26, 1986.

Finally, interest on the FL Plan's liability began to accrue on April 26, 1986.

Plaintiffs, however, maintain that the date of termination should be taken as the date on which the actual asset transfer took place. There is no authority to support the plaintiffs' proposition that termination cannot occur until the asset transfer is complete. As a practical matter, termination can preceded the actual transfer of assets. *See Bass,* 676 F.Supp. at 748. In *Bass* Conoco sold its Westlake, Louisiana chemical plant to Vista on July 20, 1984. *Id.* at 738. The sales agreement required Vista to establish a pension plan for the employees at the Westlake facility. *Id.* The new plan was to be funded by spinning off assets from the Conoco plan and transferring them to the Vista plan. *Id.* Conoco agreed to hold these assets in trust for Vista until the Vista plan received certification from the Internal Revenue Service (IRS). *Id.* On October 1, 1985, the Vista plan received IRS qualification. *Id.* at 739. The asset transfer was deemed to have occurred on that date. *Id.* Prior to the transfer of assets in 1985, Conoco, in December, 1984, added an early retirement opportunity to its plan. *Id.* Employees at the Westlake facility claimed an entitlement to early retirement benefits under the Conoco plan, arguing that the Conoco plan did not terminate with respect to them until the actual asset transfer took place. *Id.* The *Bass* court held that the plaintiffs were no longer employees of Conoco and were not entitled to benefits under the Conoco plan. *Id.* at 745. Conoco's management of the pension plan for Vista was not considered as a factor entitling Westlake employees to continued benefits under the Conoco plan, nor did the court consider the date of actual transfer indicative of when Westlake employees ceased to be covered under the Conoco plan.

Plaintiffs, like those in *Bass,* seek benefits which accrued after the business was sold. Plaintiffs' sole support for their claim is that FL Plan's continued to administer Royal Electric pension plan assets after the sale and that the actual asset transfer did not take place until October, 1988. These accommodations did not impose upon FL Industries a duty to provide retirement benefits for Royal Electric benefits beyond April 26, 1986.

Even if the termination date of the FL Plan could be established at some time after April 26, 1986, plaintiffs claims for early retirement benefits after April 26, 1986, would still fail because these benefits were neither vested nor accrued to plaintiffs at the time FL Industries sold Royal Electric to Royal Technologies. An employer does not run afoul of ERISA simply because the sale of its business affects unaccrued and nonvested benefits. *Bass,* 676 F.Supp. at 745.

### B. *Employers' Liability for Vested and Accrued Benefits*

ERISA was enacted to protect an employees' accrued, vested pension benefits. Although the terms accrued and vested are often used interchangeably by courts, these terms, while related, are not synonymous. Vesting means that a participant has gained "a nonforfeitable right to receive his [or her] entire accrued benefit." *Ashenbaugh v. Crucible Inc., 1975 Salaried Ret. Plan,* 854 F.2d 1516, 1524 (3d Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1988). A nonforfeitable right to accrued benefits occurs when "a participant or his beneficiary [has obtained a right or claim] to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." 29 U.S.C.A. § 1002(19) (West Supp. 1991). In other words, a vested right to pension benefits arises once a plan participant has met and satisfied all conditions establishing eligibility to receive the benefits. Hence, it is the satisfaction of vesting requirements which determines when a nonforfeitable right to the accrued benefit exists. *Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552, 1562 (D.C.Cir.1984).

An accrued benefit is defined in ERISA as follows: The term accrued benefit means—

(A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and ... expressed in the form of an annual benefit commencing at normal retirement age....

29 U.S.C.A. § 1002(23)(A) (West Supp. 1991). An accrued benefit is the benefit a participant earns annually as calculated according to the formula specified by the plan. *Lynch v. J.P. Stevens & Co., Inc.*, 758 F.Supp. 976, 993 (D.N.J.1991) (citing *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund*, 756 F.2d 977, 981–82 (3d Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985)). It is the benefit which a *fully vested* employee would be entitled to receive at any particular point in time under the term of the plan if his/her employment ceased at that particular point in time. *Ashenbaugh*, 854 F.2d at 1524 (emphasis added).

■ The FL Plan fully satisfied its liability for benefits which had vested and accrued under the plan through April 26, 1986, when it purchased the Lincoln National Insurance annuity contracts. These annuities provided for all normal and early retirement benefits which had vested on or before April 26, 1986. The annuities did not provide for early retirement benefits which had not vested as of April 28, 1986. Plaintiffs, however, maintain that the early retirement benefits had accrued to them and they were entitled to receive the early retirement subsidy even though they had not met the requirements for early retirement as required by the FL Plan.

There is no uniform position among the circuits as to whether early retirement benefits are accrued benefits which automatically vest when a plan terminates. Some Circuit courts have determined that contingent early retirement benefits which may commence before normal retirement age are not accrued benefits. *See Tilley v. Mead Corp.*, 927 F.2d 756, 759 (4th Cir. 1991); *Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund*, 763 F.2d 574, 577 (3d Cir.1985); *Shaw v. International Ass'n of Machinists & Aerospace Workers Pension Plan*, 750 F.2d 1458, 1464 (9th Cir.), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985). The Second Circuit posits that early retirement benefits are accrued benefits if they are *"expressed in the form of an annual benefit commencing at normal retirement age."* *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1407–08 (2d Cir.1985), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986) (emphasis in original).

■ This court takes the position that "[a]n early retirement subsidy is protected as an accrued benefit only if the participant has already met the age and service eligibility requirements or will subsequently 'grow into' the benefit subsidy. However, an employee cannot 'grow into' his[/her] right to a subsidy where he[/she] no longer works for the plan sponsor." *See Lear Siegler Aerospace Products Holding Corp. v. Smiths Industries, Inc.*, No. 88–1528, 1990 WL 422417, at *—, 1990 U.S. Dist. LEXIS 2887, at *15 (S.D.N.Y.1990). Plaintiffs had no vested interest in early retirement subsidies which had accrued on or before April 26, 1986. Their entitlement to these benefits was contingent upon their satisfaction of the age and service requirements of the plan, age 55 and 10 years of service for standard early retirement and age 55 and 15 years of service for special early retirement. It is undisputed that the named plaintiffs had not met the age and service requirements before April 26, 1986. They could not acquire an accrued interest in the early retirement subsidies until both the age and service requirements were met. They cannot point to any language in the FL Plan which excused their failure to satisfy the age and service requirements of the early retirement option, nor may they use their employment with Royal Technologies as a means to satisfy the age and service requirements of the FL Plan. Plaintiffs simply were not entitled to, nor was the FL Plan obligated to pay, benefits which were not vested or accrued on April 26, 1986. ERISA does not prevent an employer from terminating pension benefits which are neither accrued or vested. It does, however, hold an employer liable for vested, accrued benefits. Here, the FL Plan fully satisfied its liabilities with re-

gard to vested, accrued benefits through its purchase of the Lincoln National Insurance annuities.

Judgment will enter for defendants FL Industries, Inc. and FL Industries, Inc. Retirement Plan for Salaried Employees for costs.